# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| BRENT GAY<br>70040 Murphy Road<br>Flushing, OH 43977<br><br>　　　　Plaintiff,<br><br>　v.<br><br>UNION LOCAL SCHOOL DISTRICT<br>66779 Belmont Morristown Road<br>Belmont, OH 43718<br><br>　　　-and-<br><br>VAUGHN BUTLER<br>303 Church Street<br>Morristown, OH 43759<br><br>　　　Defendants. | Case No.<br><br>Judge<br><br>Magistrate Judge |
| **COMPLAINT WITH JURY DEMAND** | |

## NATURE OF THE ACTION

1.　　This is a civil-rights action for violations of the United States Constitution under 42 U.S.C. § 1983 (including violations of the First and Fourteenth Amendments to the Constitution), with supplemental claims for violations of Ohio law. The supplemental state claims are for civil liability for multiple criminal acts (assault, interference with civil rights, falsification, and disorderly conduct); assault; battery; reckless hiring, training, supervision, discipline, staffing, and retention; and intentional infliction of emotional distress.

2.     Plaintiff Brent Gay is a Belmont County community member who, on October 25, 2024, engaged in constitutionally protected free speech at a local football game between Union Local High School and Barnesville High School. At halftime, seeing Union Local losing badly, Mr. Gay asked one of Union Local's assistant coaches—Defendant Vaughn Butler—a simple question: "Did you happen to watch any film this week?"

3.     The question was a mildly tart criticism of and quip about the performance of a government official—public-high-school coach Vaughn Butler.

4.     In immediate retaliation for Mr. Gay's speech, Defendant Butler then physically assaulted Mr. Gay, causing him physical and emotional injury.

5.     Union Local School District's policies delegate full authority to their football coaches as to how the football program is conducted, including how they—as coaches—interact with the community.

6.     Butler made the final decision to engage in violence when he was confronted with the mildest criticism from a spectator.

7.     Mr. Gay now sues to assert his First Amendment rights to criticize government officials without fear of violent retribution.

8.     Defendant Butler is not entitled to qualified immunity on the federal claim because the prohibition of retaliation against private citizens exercising their First Amendment rights was clearly established law of which any government official should have known. Of course, Butler enjoys no qualified immunity for the state-law claims.

PARTIES

9.      Plaintiff Brent Gay was a resident of Belmont County, Ohio, during all times relevant to this action. He brings this action on his own behalf for damages resulting from the violation of rights secured by the United States Constitution and the Ohio Constitution.

10.     Defendant Union Local School District (the "District") is a local school district organized under R.C. 3311.03 located in Belmont County, Ohio. The District is also a "person" under 42 U.S.C. § 1983 and acted under color of law.

11.     At all times relevant to this action, Defendant Vaughn Butler was a District employee. He is sued in his official and personal capacities. Butler is a "person" under 42 U.S.C. § 1983 and acted under color of law.

JURISDICTION AND VENUE

12.     Under 28 U.S.C. §§ 1331 and 1343, Mr. Gay asserts jurisdiction over federal claims under 42 U.S.C. § 1983 and also § 1988, which provides for attorney fees in civil-rights claims. This Court has supplemental jurisdiction over Mr. Gay's state-law claims under 28 U.S.C. § 1367.

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside within the Southern District of Ohio, Eastern Division, and the events that give rise to this action occurred within this District.

FACTUAL BACKGROUND

14.     Butler assaulted Mr. Gay for his protected speech in violation of clearly established law. Mr. Gay has a right to redress because his First Amendment rights violated were clearly established at the time Butler retaliated against him for his protected criticism. So the factual

background of this lawsuit begins with the fact that Mr. Gay's rights were and are clearly established.[1]

**The First Amendment protects citizens who criticize public officials.**

15. "The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is 'the central meaning of the First Amendment." *See Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 273 (1964)).

16. Criticism of public officials—from Presidents to the coaches at public high schools—is protected speech, and the First Amendment right to criticize public officials was clear "[s]ince the day the ink dried on the Bill of Rights." *McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001).

17. Not only is this right "well-established and supported by ample case law," but it is "well-established that a public official's retaliation against an individual exercising his or her First Amendment right is a violation of § 1983." *Barrett*, 130 F.3d at 264.

18. For purposes of First Amendment analysis, public-high-school coaches, along with schoolteachers and administrators, are government officials. *See, e.g.*, *Lowery*, 497 F.3d at 589 (6th Cir. 2007) (applying First Amendment analysis to a high-school football coach's acts of dismissing rebellious students from his team); *Tinker v. Des Moines Indep. Cmty. School Dist.*, 393 U.S. 503, 509–10 (1969).

---

[1] "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, or the district court itself, or case law from other circuits which is directly on point." *Barrett v. Harrington,* 130 F.3d 246, 264 (6th Cir. 1997).

**Mr. Gay comments to Butler, lightly criticizing the team's performance.**

19. On October 25, 2024, the Union Local Jets played the Barnesville Shamrocks in Union Local's tenth game of the season. The game took place in Barnesville, Ohio. This was a rivalry match with a large crowd in attendance to see if Union Local could pull off a win after six straight losses to Barnesville in recent years.

20. Despite Union Local's best efforts, the match's fate was clear by halftime. Barnesville was up 41-0. Many fans were already trickling out of the stadium, Mr. Gay and his wife—both avid team supporters and boosters—among them.

21. Mr. Gay stood next to the short fence alongside the field, waiting for his wife to catch up after she finished talking to some friends. He watched families file down the bleacher stairs and saw several of the coaches start to leave as well.

22. Mr. Gay knew Butler. Butler was an assistant coach for Union Local, and Mr. Gay had known him for years. Mr. Gay helped build the patio on Butler's house several years ago, and in July 2024 Butler had consulted him on a fireplace project.

23. Mr. Gay considered Butler a friend.

24. As Butler left the bleachers, Mr. Gay made eye contact and asked him, "Did you happen to watch any film this week?" Mr. Gay had his hand in his pocket, his other hand holding a stadium chair, and was standing about six feet from Butler.

25. And that was all he said.

26. He didn't utter fighting words—words intended to incite an immediate violent reaction in the recipient.

27. He didn't curse (there were children around).

28. He didn't threaten Butler.

29.     He made no physical movement toward Butler.

30.     He wasn't "in Butler's face."

31.     He didn't disrupt the game.

32.     He believed he was making a harmless sarcastic criticism to the coach about the team's performance and the coaches' apparent lack of adequate preparation.

33.     In immediate, apparently hair-triggered response, Butler came fast off the last two steps of the bleachers, crossed the concrete slab, and stepped onto the gravel area where Mr. Gay was standing, lunging at and hitting Mr. Gay hard in the collarbone with both hands. The screenshot below from Lt. Tippie's bodyworn camera shows the area and distance described:



34.     Mr. Gay stumbled back, and Butler grabbed him by the coat, pulling it up and bunching it around his throat. Still holding Mr. Gay's coat, Butler forced him back as Mr. Gay flailed, trying, in self-defense, to push Butler away. Below is a photograph Mr. Gay took of his collarbone after the attack.



35.     Another coach tried to pull Butler off Mr. Gay. The group fell to the ground, and Mr. Gay was face down in the gravel, his hands pinned underneath him. He felt a kick against his ribs and then someone else on his back.

36.     Lieutenant Matthew Tippie of the Barnesville Police Department identified himself and ordered Mr. Gay to put his hands behind his back. After detangling, Mr. Gay complied, and Lt. Tippie handcuffed him.

37.     As Mr. Gay was helped back to his feet, he saw other coaches take Butler to the locker rooms. A crowd had formed, and several people were asking the officer why he was handcuffing Mr. Gay, telling him that Butler had attacked Mr. Gay, and that Mr. Gay had done nothing wrong.

38.     Lt. Tippie saw Mr. Gay's injuries and offered to take him to the hospital in his squad car.

39.     After trying to speak with Butler (and being turned away by other coaching staff—including off-duty Belmont County Deputy Sheriff Tyler Grant insisting "let's do this after the game"), Lt. Tippie removed the handcuffs from Mr. Gay and proceeded to interview a witness, Rebecca Gainer.

40.     Ms. Gainer told Lt. Tippie that Butler had shoved Mr. Gay "with all his might" and was trying to "do something" to him. She said that Mr. Gay "was, in my opinion, defending himself."

41.     Mr. Gay told Lt. Tippie he wanted to press charges.

42.     He soon left the stadium with his wife to drive to the Barnesville Police Station and file a report of the assault.

43.     Mr. Gay's ribs hurt from where he had been kicked, and he was having trouble breathing. He had cuts to his face from the gravel and had blood running into his eyes.

44.     His wife took him to the hospital, where doctors examined his ribs and treated his injuries.

45.     Below is a photo Mr. Gay took of the cuts on his face after the attack.



46.     Mr. Gay was found to have abrasions and contusions to his face and ribs, including what the doctor described as a possible rib fracture.

47.     Mr. Gay felt humiliated, upset, and in shock. He could not believe that Butler, a man he had known for decades, would assault him in front of his family and community just for voicing criticism of the coaches' performance.

48. After the assault, another witness, David Goodson, and others told Barnesville police not to arrest Mr. Gay because he did nothing. On October 28, 2024, Mr. Gay delivered Mr. Goodson's statement saying just that to the Barnesville Police Department.

49. Butler has still not been held accountable for his actions. Belmont County prosecutors had two witness statements—paralleled by the witness affidavit submitted here—affirming that Butler attacked Mr. Gay in response to Mr. Gay's critique. The prosecutor's office declined to pursue charges.

**Butler's history of allegations of violence in the education setting.**

50. This wasn't the first time that Butler has shown he's unable to contain his poor judgment and violent tendencies while on the job.

51. The District has employed Butler as an assistant varsity football coach since 1989.

52. Butler also worked for Jefferson Behavioral Health Services as a teacher from 1996–98, caring for and instructing students with behavioral, intellectual, and emotional disorders.

53. A civil suit alleged that on June 14, 1996, Butler placed a nine-year-old child with mental illness—Timothy Taylor—in the trunk of Butler's vehicle, driving around for 25 minutes with the child trapped in the trunk.

54. Butler settled with the boy's parents but also faced criminal charges at the time.

55. Defendant District knew about this but did nothing about it and recklessly kept Butler on.

**Butler's false statements about the incident.**

56.     Later that evening, after the game ended, Lt. Tippie interviewed Butler. The interview was recorded on Lt. Tippie's bodyworn camera, a true and accurate copy of which is submitted to the Court via flashdrive as **Ex. 1**.

57.     Butler told Lt. Tippie that Mr. Gay "got in my face so I just kinda pushed him away from me so I could get in the locker room, and before I knew it, I was tackled."

58.     Three days later, Butler emailed a statement about the incident to District Superintendent Zach Shutler.

59.     In his statement, Butler claimed that Mr. Gay "was in front of [him] and yelled 'Do you guys ever watch any fucking film?'" Butler then claimed he "felt threatened" and "removed [Mr. Gay] out of [his] way," only to be "attacked from behind."

60.     Butler's story of "removing" Mr. Gay from his way is at odds with both Ms. Gainer's and Mr. Goodson's eyewitness accounts of the event. It's also at odds with the story he told the police. Neither version he tells is accurate.

61.     Ms. Gainer told the police and testified in an affidavit (attached as **Ex. 2**) that Butler was the one yelling and initiating aggression, not Mr. Gay. She heard Mr. Gay "ask Mr. Butler whether he'd watched any film this week," and in response, "Mr. Butler yelled 'just get out of here' or 'what are you even doing here' and shoved Mr. Gay in the chest."

62.     And her account matches with Mr. Goodson's, who told the police and testified in an affidavit (attached as **Ex. 3**) that "Mr. Gay said to Mr. Butler, 'Did you guys happen to watch any films'" and then "Mr. Butler came off the bleachers and pushed Mr. Gay with both hands in the chest."

63.     Butler's story to Superintendent Shutler fabricated that Mr. Gay attacked him from behind. Butler's story to the police was that he was tackled.

64.     Both were false.

65.     Instead, both witnesses saw Mr. Gay ask Butler a simple question, not yelling or cursing at Butler, and get assaulted in response.

66.     Lt. Tippie's bodyworn-camera video also refutes Butler's statement to Superintendent Shutler. While the view in the video is narrow, it clearly shows Mr. Gay stumbling back after Butler attacks him, not attacking Butler from behind. A screenshot from the video is below, showing Mr. Butler (in the black jacket) falling back toward Lt. Tippie as Butler (in the red jacket) attacks him. Another coach in a red jacket runs toward them.



67.    When Lt. Tippie interviewed Butler later that evening, Butler can be seen wearing the same red jacket as above, as shown in the screenshot below.



**The District's policy and practice of delegating *de facto* decision-making authority to its coaches, including to Butler, caused Mr. Gay's injuries.**

68.     Coaches are charged with the leadership and management of their teams. *See Lowery v. Euverard*, 497 F.3d 584, 594 (6th Cir. 2007) (quoting *Wildman ex re. Wildman v. Marshalltown Sch. Dist.*, 249 F.3d 788, 771 (8th Cir. 2001) ("The coach, particularly at the high school level, is . . . responsible for providing 'an educational environment conducive to learning team unity and sportsmanship and free from disruptions and distractions that could hurt or stray the cohesiveness of the team.'")

69.     The task given to coaches like Butler requires a substantial degree of authority delegated by the District. "[His] role as a coach is to train his student athletes how to win on the court. The plays and strategies are seldom up for debate. Execution of the coach's will is paramount. Moreover, the coach controls who plays and for how long, placing a disincentive on any debate with the coach's ideas which might have taken place." *See Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1190 (6th Cir. 1995).

70.     When the District employs a football coach, it delegates to that individual the decision-making authority on how to run the team, organize the games, and conduct the football program.

71.     In turn, the coaches work to formulate long-term goals, broad objectives, and policies for how their teams operate. Whether defining the expectations of players' conduct during the games, organizing the training schedules, or deciding when the games start and stop—the coaches are the ones calling the plays.

72.     The coaches also choose how to engage with the people who come to watch the games. They interact with parents, spectators, sponsors, and community members as the public face of

the team's leadership. The coaches act as the heads of their team—that honor and responsibility does not rest with the District.

73.     Acting with this delegated authority, Butler had a choice in how to respond to a spectator's criticism of the coaching staff's preparation for the game. Rather than modeling an appropriate and measured response for his players, he chose to employ violence against Mr. Gay to retaliate against him.

74.     His decision to engage with violence was final and unreviewable by the District, given that the District did not discipline Butler for his conduct and instead the Superintendent defended his conduct to the media.

75.     Indeed, on or about October 29, 2024, Superintendent Shutler and Athletic Director Nick Nardo interviewed neutral eyewitness Rebecca Gainer over the phone and learned from her that Butler had initiated unjustified violence against Mr. Gay. They even took notes about what she saw. Yet they still failed to discipline Butler.

76.     The superintendent failed to produce those notes in response to public-records requests but did so only when pressed about the failure, trying to hide the District's policy of condoning violence.

77.     Mr. Gay would not have been injured by Butler but for the District's policy and practice of delegating total and complete authority over the football games to the coaches.

78.     Neither would Mr. Gay have been injured if the District had exercised greater control over how coaches interact with community members attending the football games.

79.     Nor did the District train its coaches not to employ violence against spectators criticizing their performance. The District could readily anticipate that spectators could be critical and that

coaches need to be trained to conduct themselves professionally and non-violently, even when emotions are running high. *Especially* when emotions about being criticized are running high.

80.     Instead, the District's policy and practice, and failure to train directly and proximately resulted in Mr. Gay's being assaulted by one of their coaches, because that coach believed it was acceptable to assault a spectator at the game who voiced disagreement with the coaches' choices.

81.     The District did not and has never disabused Coach Butler of that notion.

## CAUSES OF ACTION (FEDERAL)

### CLAIM 1
*MONELL* LIABILITY, 42 U.S.C. § 1983—POLICY AND PRACTICE; FAILURE TO TRAIN AND DISCIPLINE
(AGAINST UNION LOCAL SCHOOL DISTRICT)

82.     The above allegations are incorporated.

83.     The District engaged in a policy and practice of delegating total authority over the football program to its football coaches.

84.     Because of the District's policy and practice, Butler was granted *de facto* final decision-making authority on how to engage with spectators like Mr. Gay, among his other duties as the football team's coach.

85.     It was readily anticipatable that spectators at football games are passionate and will express strong views. Yet the District failed to train Butler not to use violence (or any force at all) against critics.

86.     When Mr. Gay voiced criticism with which Butler disagreed, Butler chose to inflict violence against Mr. Gay.

87.     Butler's decision as a coach to use violence against a spectator was final and apparently unreviewable.

88. The District did not correct its previously delegated authority. It never tried to discipline Butler or otherwise remedy his decision to use violence against spectators at Union Local football games.

89. So the District is liable under the First and Fourteenth Amendments via 42 U.S.C.§ 1983.

90. As a direct and proximate result of Butler's unlawful activity, Mr. Gay has suffered and continues to suffer economic and non-economic damages for which Defendant District is liable including, but not limited to, pain and suffering, emotional distress, and reputational harm.

91. Butler's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Butler, the District, and others from engaging in this type of unlawful conduct.

## CLAIM 2
### FIRST AMENDMENT RETALIATION, 42 U.S.C. § 1983—RIGHT TO CRITICIZE GOVERNMENT OFFICIALS
#### (AGAINST DEFENDANT VAUGHN BUTLER)

92. The above allegations are incorporated.

93. At all material times, Mr. Gay was engaged in constitutionally protected activity, exercising his clearly established First Amendment rights to criticize (mildly) Butler and the rest of the Union Local coaching staff's preparation for the October 25, 2024 football game.

94. Butler used violence to unlawfully interfere with Mr. Gay's clearly established right to criticize the coaching staff.

95. Butler's adverse actions injured Mr. Gay by restraining, preventing, and impairing his right to criticize the public-school coaches' apparent lack of preparation for the game. The assault Mr. Gay suffered was likely to chill a person of ordinary firmness from propounding

further lawful criticisms. In fact, Butler's adverse action caused Mr. Gay to cease attending any athletic events hosted by the District altogether.

96.     Butler was motivated to take his adverse action against Mr. Gay in whole or in part because of Mr. Gay's criticism. He did not attack Mr. Gay over some personal vendetta—he attacked him because Mr. Gay expressed an opinion with which he disagreed.

97.     Butler's adverse action violated Mr. Gay's clearly established First and Fourteenth Amendment rights and was unlawful under clearly established law. No reasonable public official would have believed otherwise, given the state of the law and Butler's motivations. Butler is liable under 42 U.S.C. § 1983.

98.     As a direct and proximate result of Butler's unlawful activity, Mr. Gay has suffered and continues to suffer economic and non-economic damages for which Butler is liable including, but not limited to, pain and suffering, emotional distress, and reputational harm.

99.     Butler's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Butler and others from engaging in this type of unlawful conduct.

CAUSES OF ACTION (STATE)

CLAIMS 3 (A THROUGH D)
CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60 (A)(1),
INCLUDING, BUT NOT LIMITED TO:
(AGAINST DEFENDANT VAUGHN BUTLER)

(A) OHIO REV. CODE § 2903.13(A) (ASSAULT),

(B) OHIO REV. CODE § 2921.45 (INTERFERENCE WITH CIVIL AND STATUTORY RIGHTS),

(C) OHIO REV. CODE § 2921.13(A) AND (G) (FALSIFICATION)

(D) OHIO REV. CODE § 2917.11(A)(1), (5) (DISORDERLY CONDUCT)

100.    The above allegations are incorporated.

101.    Ohio Rev. Code § 2307.60 provides: "Anyone injured in person or property by a criminal

act has, and may recover full damages in, a civil action." Ohio Rev. Code § 2307.60(A)(1).

Section 2307.60 "independently authorize[s] a civil action for damages caused by criminal acts."

*Jacobson v. Kaforey*, 149 Ohio St. 3d 398, 399 (2016). And no proof of an underlying criminal

conviction is required when bringing a civil action under § 2307.60. *Buddenberg v. Weisdack*, 161

Ohio St. 3d 160, 2020-Ohio-3832, 161 N.E.3d 603, ¶ 11.

102.    For the Court's convenience, criminal acts Butler committed are consolidated under this

single numbered claim, with lettered subparts, although any single one of them would establish

separate civil liability under § 2307.60.

103.    Ohio Rev. Code § 2903.13(A) (**Assault**) (**Claim 3(a)**) provides that "no person shall

knowingly cause or attempt to cause physical harm to another..."

104.    Under Ohio Rev. Code § 2901.22(B):

> A person acts knowingly, regardless of purpose, when the person is aware that the
> person's conduct will probably cause a certain result or will probably be of a certain
> nature. A person has knowledge of circumstances when the person is aware that such
> circumstances probably exist. When knowledge of the existence of a particular fact is an

element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

105.    Defendant Butler knowingly caused and attempted to cause physical harm to Mr. Gay, without justification.

106.    Ohio Rev. Code § 2921.45(A) (**Interference with Civil and Statutory Rights**) (**Claim 3(b)**) provides that "No public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right."

107.    Various federal and Ohio constitutional and statutory rights are detailed above and below. Defendant Butler, a public servant, under color of his office, employment, and authority, knowingly deprived, and attempted to deprive Mr. Gay of a constitutional and statutory rights, including his right to be free from First Amendment retaliation, and his other Ohio statutory rights described in this claim.

108.    Under the relevant part of Ohio Rev. Code § 2921.13(A) (**Falsification**) (**Claim 3(c)**):

No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies:

(1) The statement is made in any official proceeding.

(2) The statement is made with purpose to incriminate another.

(3) The statement is made with purpose to mislead a public official in performing the public official's official function.

(Cleaned up.)

109.    Ohio Rev. Code § 2921.13(G) also provides for a separate civil cause of action for damages, including attorney fees, costs, and expenses, for violations of Ohio Rev. Code § 2921.13(A) (**Falsification**).

110.    Under Ohio Rev. Code § 2921.01(A):

> "Public official" means any elected or appointed officer, or employee, or agent of the state or any political subdivision, whether in a temporary or permanent capacity, and includes, but is not limited to, legislators, judges, and law enforcement officers. "Public official" does not include an employee, officer, or governor-appointed member of the board of directors of the nonprofit corporation formed under section 187.01 of the Revised Code.

111.    Defendant Butler's statements to Lt. Tippie and to Superintendent Shutler about the incident with Mr. Gay were false statements made with purpose to incriminate another and made with purpose to mislead public officials in performing the public officials' official functions, "investigating" the incident.

112.    Ohio Rev. Code § 2917.11(A) (**Disorderly Conduct**) (**Claim 3(d)**) provides that no person shall recklessly cause inconvenience, annoyance, or alarm to another by:

(1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;

(5) Creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender.

113.    Defendant Butler recklessly caused inconvenience, annoyance, and alarm to others by engaging in fighting, in threatening harm to persons or property, and in violent or turbulent behavior; and by creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by acts that served no lawful and reasonable purpose.

114.     As a direct and proximate result of each item and all of this unlawful conduct, Mr. Gay has suffered and will continue to suffer economic and non-economic damages for which Butler is liable, including, but not limited to, pain and suffering, emotional distress, and reputational harm.

115.     Butler's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Butler and others from engaging in this type of unlawful conduct.

### CLAIM 4
### CIVIL ASSAULT
### (AGAINST DEFENDANT VAUGHN BUTLER)

116.     Plaintiff incorporates all previous allegations.

117.     Butler's attack on Mr. Gay caused Mr. Gay reasonable apprehension of an immediate harmful or offensive contact.

118.     As a direct and proximate result of this unlawful conduct, Mr. Gay has suffered and will continue to suffer economic and non-economic damages for which Butler is liable, including, but not limited to, pain and suffering, emotional distress, and reputational harm.

119.     Butler's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Butler and others from engaging in this type of unlawful conduct.

### CLAIM 5
### CIVIL BATTERY
### (AGAINST DEFENDANT VAUGHN BUTLER)

120.     Plaintiff incorporates all previous allegations.

121.     Butler intentionally caused harm or offensive contact to Mr. Gay without his consent.

122.     As a direct and proximate result of this unlawful conduct, Mr. Gay has suffered and will continue to suffer economic and non-economic damages for which Butler is liable, including, but not limited to, pain and suffering, emotional distress, and reputational harm.

123. Butler's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Butler and others from engaging in this type of unlawful conduct.

## CLAIM 6
### RECKLESS HIRING, TRAINING, SUPERVISION, DISCIPLINE, STAFFING, AND RETENTION (AGAINST DEFENDANT UNION LOCAL SCHOOL DISTRICT)

124. Plaintiff incorporates all previous allegations.

125. Defendant Union Local School District failed to exercise due care and acted in a reckless manner in hiring, training, supervising, disciplining, staffing, and retaining Vaughn Butler, who was unfit for his position and duties.

126. Defendant Union Local School District either recklessly failed to conduct appropriate background check and ongoing vetting of Butler or, if it did so, was at a minimum reckless about whether someone like him or those who supervised or trained him were unfit for their positions.

127. As a direct and proximate result of this unlawful conduct, Mr. Gay has suffered and will continue to suffer economic and non-economic damages for which the District is liable, including, but not limited to, pain and suffering, emotional distress, and reputational harm.

128. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Glaze sustained the damages alleged above.

## CLAIM 7
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AGAINST DEFENDANT VAUGHN BUTLER)

129. Plaintiff incorporates all previous allegations.

130. In conducting himself as he did—by attacking Mr. Gay in retaliation for his exercise of his free-speech rights and then lying to government officials about it—Butler either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to Mr. Gay.

131.    Defendant Butler's conduct toward Mr. Gay of assaulting and battering him with retaliatory motive for speech, with no warning or legal justification, went beyond all possible bounds of decency and was such that it could be considered intolerable in civilized society.

132.    As a direct and proximate result of this unlawful conduct, Mr. Gay has suffered and will continue to suffer economic and non-economic damages for which Butler is liable, including, but not limited to, pain and suffering, emotional distress, and reputational harm.

133.    Defendant Butler's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Butler and others from engaging in this type of unlawful conduct.

**PRAYER FOR RELIEF**

For the foregoing reasons, Mr. Gay respectfully requests that the Court:

A.    Enter judgment in Mr. Gay's favor on all claims for relief;

B.    Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments to the United States Constitution, as well as of 42 U.S.C. § 1983.

C.    Declare that Defendants are liable for damages on all claims for relief;

D.    Award full compensatory damages, including but not limited to damages for pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Mr. Gay has suffered and is reasonably certain to suffer;

E.    Award punitive and exemplary damages for the individual Defendants' callous and reckless disregard of Mr. Gay's constitutional rights;

F.    Award pre- and post-judgment interest at the highest lawful rate;

G.    Award Mr. Gay his reasonable attorney fees and all other costs of suit available under 42 U.S.C. § 1988;

H.      Award all other relief in law or equity to which Mr. Gay is entitled, and that the

Court deems equitable, just, or proper.

### JURY DEMAND

Mr. Gay demands a trial by jury on all issues within this Complaint.

Dated: June 12, 2025                    Respectfully submitted,

*/s/ Subodh Chandra*
Subodh Chandra (OH Bar No. 0069233)
Ethan M. B. Dawson (OH Bar No. 0103801)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Ethan.Dawson@ChandraLaw.com

*Attorneys for Plaintiff Brent Gay*